HARRIS *v.* MICHIGAN MUTUAL HAIL INSURANCE CO.

1. INSURANCE—HAIL INSURANCE—GROWING FRUIT—DEFINITION.
    Fertilized growths on apple and pear trees, which in due
    course would have been apples and pears, *held*, to be
    within the terms of a hail insurance policy, indemnifying
    insured against damage to "growing grain, fruit, and
    other farm products," in the absence of a rule in said
    policy defining growing fruit.

2. SAME—DAMAGES—EVIDENCE—SUFFICIENCY.
    Where, in such action, it cannot be said that there was no
    competent evidence before the jury of the damages sus-
    tained, and no complaint is made that the judge's charge
    to the jury was erroneous, the judgment in favor of plain-
    tiff will be affirmed.

Error to Van Buren; Des Voignes, J.  Submitted
April 29, 1919.  (Docket No. 12.)  Decided July 18,
1919.

Assumpsit by George E. Harris against the Michi-
gan Mutual Hail Insurance Company on a policy of
insurance.  Judgment for plaintiff.  Defendant brings
error.  Affirmed.

*Kinnane, Black & Leibrand,* for appellant.

*William J. Barnard* and *Earl L. Burhans,* for ap-
pellee.

OSTRANDER, J.  The plaintiff made written appli-
cation to defendant for membership and for—

"indemnity against damage or loss to growing grain,
fruit, and other farm products   *   *   *   $1,000 on
112 acres of fruit, on Sec. 20, Lawrence Twp., Van
Buren Co., Mich."

—from noon of the 25th of May, 1915.  The policy
issued upon this application recites that plaintiff—

"has this 25th day of May, 1915, become a member" of the defendant company and "has insured in said company, against loss or damage to growing grain, fruit, and other farm products by hail, to the amount of $1,000, from noon of the 25th day of May, 1915."

The premises and specification of the insurance are as stated in the application, namely, "$1,000 on 112 acres of fruit, Sec. 20, Lawrence Twp." * * * The undertaking of the company is—

"to make good unto the said insured * * * all such loss or damage, not exceeding the amount insured, as shall happen by hail to the property above named, and more specifically described in the application on file, * * * which is hereby made a part of this contract, from the 25th day of May, one thousand, nine hundred and fifteen, * * * the said loss or damage to be estimated according to the actual cash value at the time the same is adjusted." * * *

The policy was in force May 8, 1916, on which day a violent hail storm occurred at the plaintiff's farm. Plaintiff then had, on section 20, about 2,000 bearing fruit trees from 14 to 40 years old, apple and pear trees. He notified the defendant that he had sustained a loss by the hail storm. Officers of the defendant visited the orchards, there was some correspondence. Finally, after an attempt had been made to adjust the loss, and on October 16, 1916, defendant wrote plaintiff a letter, signed by its secretary, the pertinent portions of which are:

"We will say in regard to your claim for damages by hail on May 8, 1916:

"*First,* that blossoms are not fruit and, hence, is not covered by the policy.

"*Second,* that on your pear orchard on which you claimed 50 per cent. loss, did not show to as good fruit men as are in Van Buren county, any loss by hail. So if any loss occurred to your crops, it was from something besides the hail of May 8, 1916."

In September, 1917, plaintiff filed his declaration in this cause, with a bill of particulars. Defendant pleaded the general issue. The cause came on to be tried in February, 1918. Plaintiff offered, defendant did not offer, testimony. There was a motion by defendant for a directed verdict upon the grounds:

(1) That plaintiff had shown no injury to any property covered by the policy, namely, growing fruit.

(2) That the plaintiff "has failed to show any damages that could be submitted to a jury at this time, all damages from whatever cause they may have occurred, or whether they occurred or not, being uncertain, speculative and contingent."

There was a verdict for plaintiff for $1,056.60, upon which judgment was entered. The grounds asserted in the motion for a directed verdict are those urged here for a reversal of the judgment. Upon the first point, defendant, appellant, presents the question in this way:

"Whether or not," it says, "the incorporators had in mind the line of demarkation where the protection would commence, there certainly is a line somewhere and that line must be ascertained from the language they used. If we say 'growing fruit' includes blossoms, then it is by a hair's breadth to the next station and include fruit buds. Horticulture teaches and the evidence shows that the fruit of this year is produced from buds grown last year. Therefore damage to this year's fruit buds may have a tendency to damage next year's fruit crop. Having gone that far it is only a very short step to the next station, by claiming that inasmuch as damage to fruit buds is proof of damage to fruit, proof of damage to leaf buds ought to be admitted as proof of damages to fruit on the theory that damage to the foliage has a tendency to damage the fruit crop, present or future. This line of reasoning could be continued like the rhyme of 'The House that Jack Built,' to include future damage to foliage, damage to the limbs of the trees, then to the trunk, then to the soil from which the trees draw their sustenance, etc.

"It must be clear that these farmers intended mutually to insure another against loss or damage to some kind of growing fruit and grain, not something that might or might not develop into growing fruit and grain.

"To determine what the contract is we must resort to the language used in the writing. There is no parol testimony from which assistance may be had in the construction and whatever that construction is found to be, the parties must be held to be bound by it."

It refers to the Century dictionary, the New International Encyclopedia, and to the opinion of a Federal court (*Nix* v. *Hedden,* 39 Fed. 109, 149 U. S. 304) for a definition of the word fruit. With respect to these definitions it is said:

"It will be observed that one element tenaciously present in all these definitions is the element of seeds. We find no comprehensive definition of the term 'fruit' which does not contain the element of 'seed.' We can then say that unless the blossoms contain seed they would not be fruit within the purview of the policy.

"There is no evidence that any of those blossoms or fruit buds contain seed resulting or contained in a pollenized ovary which develops into the core and obtains the result of proper fertilization—seed.

"Pollen is referred to by some of the witnesses as seed, but pollen is not the seed mentioned in the definitions. The stamens which contain the pollen is part of the blossom (the leaves and carpels), and is never contained in the growing or ripened fruit. The seeds of fruit have such a well known meaning that no one can be mistaken as to what is meant when it is said that one of the constituent elements of fruit is seed, contained in and covered by the juicy, pulpy product of a tree or plant.

"This would seem to be the only logical place to draw the line. The policy covers when the embryo apple is sufficiently advanced so that the presence of seed is susceptible of proof, until then five-sixths of the blossoms may not be fertilized and those not fertilized would, of course, never develop into fruit.

"To hold the other policyholders liable for damages to blossoms that would never have developed even into

a fertilized embryo apple was certainly not within the contemplation of the incorporators. It would be doing violence to their language to so hold."

Counsel for appellee, directing attention to the fact that in the policy the words growing fruit are employed to describe the risk insured, refers to the lexicographers and to botanists for definitions of "growth," "grow," "growing," and to Black's and Bouvier's dictionaries for a definition of "growing crop," and they say that anything that is developing is growing and—

"We claim fruit is growing fruit any time after the ovary within the blossom is pollenized, or is impregnated, as it were. From that point life begins and from then to maturity it is merely in its stages of growth. True, a bare blossom is but a possibility. The ovary of the blossom contains what we call ovules. On receiving the pollen it fertilizes and the ovules become seeds. Where fruit is spoken of as a ripened ovary, we find botanists using this word in the sense of a pollenized or impregnated ovary."

Upon the other point the defendant, appellant, says, in the brief in concluding the argument:

"In this case there were no damages whatever proved. There was no proof that the blossoms claimed to have been injured had been far enough advanced to have even developed into embryo fruit. There is absolutely no proof of any kind or character as to how many bushels less the plaintiff probably received as a result of the hail storm. There is not even any proof of that character to enable the jury to make any kind of a guess. What the jury did was to simply allow plaintiff the full face of the policy without having anything before them by which they could tell whether his damages were $1,000, $100, or $10,000. There was just as much proof as to any one of the above three sums as there was to either of the other two."
* * *

To this, appellee replies, generally, that difficulty in ascertaining the damages is not a reason for refusing

recovery, and that it does not follow that because their ascertainment is difficult they are therefore uncertain, remote or speculative. He asserts that the damages may be measured by the difference between what his orchard, affected by the hail, produced, and what other orchards in the immediate locality, not affected by the hail, produced. For the purpose of applying this rule, he contends that the record furnishes an ample basis. The rules given to the jury by the trial court we do not know, none of the charge of the court appearing in the printed record, and no complaint being made that the charge was erroneous.

Defendant is a mutual company and its articles and by-laws are printed upon the policy which it issued to plaintiff. In the articles of association, the "object" of the company is stated to be—

"to mutually insure the property of its members against loss or damage by hail on grain, fruit and other farm products in such a manner as set forth in its by-laws."

The 16th article provides that the company insures its members against loss or damage by hail to growing crops—on farm crops not to exceed $30 an acre, on fruit and garden truck not to exceed $100 per acre.

"The rate of assessment on fruit and garden truck shall be treble what it is on farm crops."

It is provided in the by-laws that a loss exceeding $100 shall not be adjusted before the maturity of the crop, and further provided that the association will not be liable for any loss or damage except that occasioned by hail.

The testimony tended to prove a rather severe hail storm, the wood of trees and buildings being scarred, the blossoms knocked or cut from the trees, that plaintiff had in one field 550 apple trees, 15 years old in 1916, in another about 800 apple trees, 10 years old, that there were also 940 or 950 Keifer, 400 Bartlett,

and 150 Angel pear trees, 14 years old in 1916. On the 8th of May, 1916, the trees had been in blossom for a week or more and the blossoms were dropping.

The secretary of defendant, called as a witness by the plaintiff, testified that he looked the orchards over June 14, again in September, and a third time in October, that he estimated plaintiff's loss on his pears at from 300 to 350 bushels. To this effect, under date October 9, 1916, he wrote to plaintiff. He testified, also, that he never admitted plaintiff had any loss on his apples by hail. In what manner this witness estimated the loss of pears is not shown. No expert biologist or botanist gave testimony. A number of fruit growers, with large practical, but with little theoretical, knowledge of the subject, gave testimony. Plaintiff, on direct examination, testified, in part, as follows:

"The hail storm had the effect of knocking off the blossoms, that is, the fruit on the stem. It cut some of them. That morning I went out and found the blossoms cut off. Some was knocked off entirely and some was cut off so you could cut it with shears, the little fruit, the fruit, you know; after the blossoms, you know how the fruit looks. After these white leaves, blossoms, drop off, there is your fruit right there, and it cut them off. They were all over the ground, it was covered.

"Q. With things that you could identify as apples and pears?

"A. Yes, sir.

"Q. I will ask you if previous to the storm, you had examined blossoms out there with regard to whether or not pollenization or fertilization had taken place. You know what I mean when I speak of a stamen, don't you?

"A. Yes.

"Q. What was the condition of that practically on the end of the stamen—now I don't know what they call it?

"A. Well, the way that I should call that, it was ripe, it was kind of a brownish; it had turned brown.

When they first come out they are white and then they turn kind of a yellowish color and grow a little darker.

"*Q.* When they turn that color what is that an evidence of?

"*A.* That the pollen is distributed."

On cross-examination, he testified, in part:

"Friday, previous to the hail storm, I opened up some of the buds to show Mr. High some of the inside, the fruit; you can see the fruit with the naked eye when they are blossomed. You could see the small apple. The apple would be about the size of a pin head. The blossoms were about half on. It showed the fruit on May 4th or 5th. I went out there to show him my prospect of the fruit crop. When I went out there, Monday morning, I don't know as I saw a branch broke off from the trees, but I saw that my blossoms was cut. Some was knocked clear off from the main branch and some was cut just as you cut it with shears. And they were laying all around on the ground with the fruit in the blossom. That I did notice that it knocked off the blossoms that had the fruit set in them and that they were laying on the ground. There are always more blossoms than a tree is capable of bearing apples or pears. Not all the blossoms were cut off, there was those left, Monday morning, that I thought at the time might make a crop, but in two or three days those stems had been hit with the hail and turned black. Then I knew I had a pretty heavy loss and got busy and wrote Garber. There are different things that might injure the blossom and kill the fruit, besides the breaking off of the stem. A cold, steady rain for a week will damage the blossoms and a hard enough freeze will hurt apples. * * *

"*Q.* Did you, at any time previous to the trial, claim any damage on growing fruit? Was it not always damages to the blossom?

"*A.* On growing fruit. I claim that the blossom, when it gets developed as far as they was developed, is growing fruit, because your fruit is in the—you can open it—I have opened probably thousands of them; I am always in the orchard seeing how they are

coming, probably 3 or 4 days in a week, I go out in the orchard and open up these blossoms—and you can see it. If you have ever examined it yourself you can see it.

"*Q.* Your position is that the blossom was injured and as a result the fruit would be injured?

"*A.* Why, the fruit was injured when the blossom was injured; it is all the same thing; the fruit was there with the blossom."

Another witness, a fruit grower of long experience, testified:

"From my observation, I find an apple makes two kinds of growth, what we call wood growth and blossom growth. All apple buds are produced, practically all of them, on the end of a fruit spur which must be produced the season previous or some time before the blossom bud can be formed. Many other fruits have lateral fruit buds that grow on the previous year's growth, as a peach, but the apple grows on a fruit spur which is made in some previous year before that, and the bud for the ensuing year's crop— the bud for the 1916 crop would be completed during the growing season of 1915, and in the following spring, if nothing should happen to injure that bud in any way whatever, I think there could be no reason whatever why that bud shall not proceed to grow and make a bloom and we believe, from my observation, that every perfect bloom, under right weather conditions, fertilizes. Later on, as the apple begins to grow, nature eliminates the weakest of these apples and thins them—what we call the June drop—and usually thins them down to the crop that the tree can mature.

"*Q.* From your experience as an apple man, can you tell by the examination of the apple tree whether or not the apple has been fertilized?

"*A.* Under normal conditions, under normal weather conditions, when the petals begin to drop naturally the growth of the little apple is visible, at the time which the petals drop naturally.

"*Q.* By the petal you mean the flower?

"*A.* The white bloom of the apple. But my observation is that when the petal drops normally fertiliza-

tion has taken place and to prevent—the only thing that will prevent its making an apple or starting to grow—and until that dropping period what we call the June drop—would be some disease affecting the apple, or bad weather conditions; that might affect it. I think that apples may be sometimes fertilized and still injured later by bad weather conditions, but it would be very exceptional; as an incident, I might give the year, I think, of 1910, when our apples blossomed in April; on the 16th of April, apple trees were in full bloom in our township; that is the year snow went off about the latter part of February and we sowed our oats in March—but that was very exceptional— and that year, in May, we had a very severe snow storm and freeze from the northwest and it practically ruined the apple crop which was formed at that time. That is the only instance I know of being ruined from that cause after fertilization has apparently taken place or positively taken place.

"Q. And after these petals have begun to drop normally the fruit is then growing?

"A. Yes, sir.

"Q. And it can be distinguished, you say?

"A. Yes, sir. One point I would like to make. Every observer knows that a cluster of about 6 or 7, 5 to 7 blossoms—in each apple bud, contains 5 to 7 blossoms separately, and the center one of those seems to be a stronger bud than the others and blossoms generally about two days earlier than the other blossoms open; and that center blossom usually fertilizes and the petals begin to drop by the time the others are in full bloom. And in our own orchard at home, we had one crop of Jonathans, a very good crop that consisted entirely of apples formed from that one strong bloom in the center which blossomed two days previous to the others coming out, and the others were destroyed, simply withered up and turned brown, the petals did, and made no apples and didn't fertilize.

"Q. From your observation as an apple man, can you tell by the examination of these petals on the tree, whether or not fertilization has taken place—that is, supposing it has not taken place, explain what condition you find the petals in?

"A. I find when weather conditions are so as preventing apples fertilizing that the petals remain on

very much longer than in case fertilization has taken place, if the weather conditions are such and it is damp and the pollen can't circulate; I suppose that is the reason, but the petal will remain for a long period; I have known it to remain for ten days or two weeks.

"*Q.* Under favorable weather conditions, where it is warm, how long does it take for fertilization to take place?

"*A.* I think under perfect weather conditions, that the apple will, at the expiration of two days after the apple is in full bloom, that the petals will begin to drop."

Other witnesses gave testimony to the same effect.

The articles of association and the policies issued by defendant seem to make no distinction between fruit and grain or other farm products. These members ought to have agreed among themselves concerning the state to which nature must have brought growing grain and fruit before liability would attach for its destruction, if they did not want the courts to give to the words employed by them a popular meaning. The argument of defendant that blossoms are not insured could be modified and used in the case of grain by saying that the growing wheat plant or corn plant was not insured. Suppose the property insured and destroyed was a field of wheat, not headed out, or a field of tomatoes, with plants in blossom or having lost some or all of their blossoms. Without applying to the contracts of these mutually insuring members of the defendant corporation the rule that the language used by the insurer in the policy will be given a meaning favorable to the insured, we are justified in saying that in popular phrase wheat not headed and corn upon which no ears have formed are growing grain. It being so easy, and manifestly so proper, for defendant to state a rule, we shall attempt to state none for its guidance. We are contented to say that evidence was introduced which fairly tends to prove that

the trees in plaintiff's orchards had on them growing fruit, fertilized growth, which in due course of time would have been apples and pears, for the destruction of which by hail the defendant, by the terms of its policy, may be liable.

The subject of the damages sustained by plaintiff has given us greater trouble. It must be assumed that the defendant did not intend merely to collect premiums and suffer no losses. Rarely, will two orchards, or two fields of growing grain, with different owners, be found where the soil, the exposure, the tillage, are the same. The rule that to prove the extent of his loss by the crops secured by a neighbor whose orchard was untouched by the hail, the plaintiff must prove that in the orchards compared the soil, moisture, exposure, fertilization, spraying, were the same, is not a workable one in such a case as this. Corporations like defendant have themselves made a practical rule for estimating damages to grain by hail which is (*Barry* v. *Insurance Ass'n,* 110 Iowa, 433, 437 [81 N. W. 690, 692]) :

"The loss in all cases shall be considered the difference between the amount grown on the damaged tract, and a fair average of the same kind grown on an equal tract in the immediate neighborhood, where no damage was sustained."

In the case at bar, the testimony for plaintiff tended to prove that there were in the immediate neighborhood orchards of pear and apple trees not affected by the hail and some trees in the plaintiff's orchards somewhat protected from the storm. The yield of the protected trees, the usual yield of the orchards themselves, the yield of fruit in the neighborhood orchards, these facts were laid before the jury. The cost of picking, packing and marketing the crop was in evidence. We are not warranted in saying that the jury had before it no competent evidence of the dam-

ages sustained. We must assume that the court properly instructed the jury upon the subject. The court did not err in refusing to direct a verdict for defendant.

The judgment is affirmed, with costs to appellee.

BIRD, C. J., and MOORE, STEERE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.